557 So.2d 807 (1989)
James F. BANTON, et al.
v.
T. Morris HACKNEY.
Ex parte James F. BANTON, et al.
(Re T. Morris HACKNEY v. James F. BANTON, et al.)
88-637, 88-632.
Supreme Court of Alabama.
September 29, 1989.
Rehearing Denied January 19, 1990.
*808 James L. Shores, Birmingham, for James F. Banton.
Thomas Allan Wingo, Jr., Birmingham, for Susan A. Banton.
David R. Donaldson and J. Michael Rediker of Ritchie and Rediker, Birmingham, for appellee and respondent.
PER CURIAM.
We have studied the briefs of the parties, the record, and the complete order of the trial court in this matter, and we have concluded that the judgment is due to be reversed, and the cause remanded, and the writ denied. We set out the lengthy opinion of the trial court so that the factual and legal complexities of this case will be more clearly understood:
"This case has now been submitted for decision on the motion for preliminary injunction filed by the plaintiff, T. Morris Hackney (`Hackney'), against James F. Banton (`Banton') and also on the motion for partial summary judgment filed by Hackney against Banton and Jane J. Long (`Long').
"The claims asserted by Hackney in this case are the result of his purchase from Banton and Long of all of the outstanding shares of capital stock of Banton, Inc., which in turn owned all of the outstanding stock of its subsidiary, Banton Industries, Inc. For purposes of this order, the two corporations will hereinafter be referred to as Banton, Inc.
"In his complaint, Hackney says that he was induced to agree to buy the shares of stock of Banton, Inc., and that he did buy such shares in reliance on the materially false representations made to him by Banton and Long with respect to the financial condition of Banton, Inc., and the results of its operations. Hackney alleges in his complaint that he paid to Banton and Long the sum of $1,100,000.00 in cash and also executed guarantees of approximately $5,000,000.00 of Banton's debt in connection with such purchase.
"Hackney also alleged that Banton was aided and abetted by Long in suppressing or concealing from Hackney material facts relating to the financial condition of Banton, Inc., and its operations. Hackney seeks a preliminary injunction and ultimately *809 a permanent injunction imposing a constructive trust on the monies paid to Banton by Hackney and on the investments made and assets purchased with such monies.
"In a separate count, Hackney has also charged Banton and Long with violations of the Alabama Blue Sky Laws (§ 8-16-17, et seq., Alabama Code 1975). In this count, Hackney has alleged that in connection with the offer and sale of shares of the capital stock of Banton, Inc., Banton and Long made untrue statements of material fact and omitted to state material facts necessary to be made in order that the statements that they did make, in light of the circumstances under which they were made, would not be misleading.
"Hackney has also asserted claims against Ledbetter, Cork & Bethune, a partnership; and the partners, Alan T. Ledbetter, David R. Cork and James T. Bethune, Jr. As the basis for his claim against the accountants, Hackney has alleged that they audited the July 31, 1987, financial statement of Banton, Inc., and prepared and signed the opinion letter regarding their audit. Hackney says the accountants were negligent in failing to correct misstatements of material facts and omissions of material facts in the financial statement dated July 31, 1987, of Banton, Inc., and thereby proximately caused Hackney's damages.
"The merits of Hackney's claims against the accountants will not be considered in this opinion.
"Banton, Inc., is a manufacturing concern in the business of manufacturing for sale an engine-driven machine used by gardeners primarily for tilling the soil. Banton was the owner of 100 shares and Long was the owner of 3 shares of the outstanding stock of Banton, Inc.
"In October, 1987, Banton engaged Sam Sumner, a business broker, to sell the business of Banton, Inc. Sumner contacted Hackney, who became interested in purchasing the business. Banton provided Hackney initially with a copy of the audited financial statement of Banton, Inc., for the fiscal year ended July 31, 1987. The certification to this statement by the accountant was dated September 12, 1987. This statement showed current assets as follows:

 1987 1986
 Cash $ 17,150.00 $ 80,915.00
 Accounts Receivable Less
 Allowance for Doubtful
 Accounts of $25,000.00 in 1987
 2,823,138.00 1,228,344.00
 Inventories 1,525,574.00 982,705.00
 Prepaid Expenses 21,938.00 16,132.00
 ______________ ______________
 TOTAL CURRENT
 ASSETS $4,387,800.00 $2,308,096.00

"Note 1 to the financial statement included a statement that inventories were valued at the lower of cost or market.
"Note 2 to the financial statement provided an itemized breakdown of the inventory as follows:

 1987 1986
 Finished Goods,
 Engines and
 Items Purchased
 for $1,150,508.00 $673,732.00
 Work in Process 218,995.00 226,861.00
 Raw Materials 156,071.00 82,112.00
 _____________ ___________
 $1,525,574.00 $ 982,705.00

*810 "The gross sales for the fiscal year ended July 31, 1987, as reflected by the audited financial statement, were $3,069,417.00. After deducting $1,490,304.00 as the cost of sales, the net amount realized from sales was shown as $4,579,113.00.
"Income from operations for the year was shown as $470,552.00. After provision for income tax and the write-off of its investment in its affiliates, net income was indicated in the amount of $250,361.00.
"Hackney was later shown unaudited financial statements for the quarter ending October 31, 1987, and also an unaudited balance sheet as of December 31, 1987. Banton knew that Hackney was relying on both the audited and unaudited financial statements in making the decision whether to purchase the business from Banton.
"The October 31, 1987, unaudited balance sheet reflected shareholders' equity in the amount of $872,260.00. The December 31, 1987, balance sheet showed shareholders' equity in the amount of $929,487.00.
"The October 31, 1987, quarterly unaudited profit and loss statement showed sales for the fiscal year to date (August 1, 1987, to October 31, 1987) in the amount of $885,652.91 and net income after taxes in the amount of $98,614.26, an increase in sales of approximately $153,000.00 over sales for the same period of the preceding year and an increase in net profits of approximately $14,000.00 over the same period of the preceding year.
"On December 18, 1987, Hackney met with Banton and Long to discuss the purchase of Banton, Inc. They reached an oral agreement, later confirmed by a letter from Hackney, that the purchase price would be the `Net Asset Value (Equity on Book Value) as determined by an opinion audit as of the closing date.'
"Hackney proposed to pay $550,000.00 on the closing of the sale and to execute a promissory note for the remainder of the purchase price. He stated in his letter that `estimating $1,000,000.00 net asset value at closing, this note would be $450,000.00.'
"Hackney also proposed to pay Banton $750,000.00 at the rate of $150,000.00 a year for five years in consideration of Banton entering into a no compete-consulting agreement. Hackney also proposed to pay Long a total of $22,500.00, payable in annual installments of $4,500.00 each for a period of five years.
"In reply, Banton proposed that the promissory note and the no compete-consulting agreement be structured so that the same could be sold to a bank without recourse to him. In addition, Banton asked that all personal guarantees by him and his wife be removed at closing. Banton testified during the trial that he needed $1,000,000.00 in cash at the time in order to participate with other persons in an attempt to acquire control of a publicly traded corporation.
"The written agreement providing for the sale of the capital stock of Banton, Inc., by Banton and Long to Hackney was signed on January 19, 1988. In it, Banton and Long specifically represented and warranted, among other things, that:
"`(a) The October 31, 1987, financial statements and the 1987 audited financial statement for the fiscal year ended July 31, 1987, were "true and correct" in every material respect, and that they were prepared in accordance with generally accepted accounting principles ("GAAP") consistently applied;
"`(b) There were "no material liabilities or obligations of any nature" not reserved against;
"`(c) The company's accounts receivable were "collectible in full less the reserve for bad debts shown thereon";
"`(d) The company had no disclosed contractual liabilities for goods furnished prior to January 31, 1987; and
*811 "`(e) That the company's accounts receivable as of January 31, 1988, were collectible in full (less reserve shown for bad debts).'
"The agreement specifically provided that the warranties and representations stated above survived the closing for a period of six months (paragraph 15(a)(ii)). Under the written agreement, Hackney agreed to pay $550,000.00 in cash; to provide $150,000.00 to Banton, Inc., so that it could pay a note issued by it to Banton; and Hackney also agreed to personally guarantee the debts of Banton, Inc., to its lenders and to cause Banton, Inc., to execute employment agreements with Banton and Long.
"The sale was closed on February 2, 1988. At the closing, Banton received $683,980.59 and Long received $16,019.41. On February 10, 1988, Banton went to AmSouth Bank and, on the strength of Hackney's personal guarantee, borrowed $400,000.00. Banton represented to AmSouth that he wanted the proceeds for `an investment.' Banton told AmSouth that he expected to repay the loan with the proceeds of Hackney's promissory note to be executed following the balance sheet audit as of the closing date.
"Banton did not invest the money as he had represented to Hackney and AmSouth. He paid off mortgages of $404,569.95 (a mortgage on his residence) and $153,387.68 (a mortgage on his condominium). The sum of $350,000.00 was also deposited by Banton in an account in a Florida bank in the name of his wife, Susan A. Banton.
"Approximately two weeks following the closing of the sale, Hackney was informed that Banton, Inc., was short of operating capital despite the representations of the financial health of Banton, Inc., made to Hackney on February 2, 1988, and earlier.
"On February 17, 1988, Hackney received a call from Fred Whitson, president of a company doing business under the name of `Power Tool Company.' According to the books and records of Banton, Inc., Power Tool had placed a $90,000.00 [order] with Banton, Inc., during January 1988, and owed Banton, Inc., that amount.
"In his telephone call, Whitson informed Hackney that Power Tool had received a $90,000.00 invoice despite the fact that Power Tool `had no business relationship with Banton Industries.'
"Hackney then began making an investigation of the financial condition of Banton, Inc., and discovered that the financial information previously furnished him in the various financial statements was false and misleading in material respects. It was also established that both Hackney and Long knew or had reason to know that this was so.

"I. GROSS SALES MISSTATED
"Banton, Inc., had a comprehensive general liability insurance [policy] issued through R.C. Britt, an insurance agent, the premium for which was based on the amount of the gross sales of Banton, Inc. Each year Banton, Inc., paid a premium based on its sales projection for the coming year. At the end of the year, the insurer compared the projected sales with the actual sales figures and either billed for an additional amount or allowed a credit, depending on whether the sales were higher or lower than projected.
"Prior to the renewal of the insurance policy during September, 1986, Long had estimated gross sales for Banton, Inc., for the coming year at $2.2 million.
"By letter dated November 12, 1987, R.C. Britt, an insurance agent, wrote Long asking for the total sales of Banton, Inc., for the period from September 14, 1986, to September 14, 1987. He stated that he needed these figures to calculate the insurance premium adjustment on the commercial umbrella insurance policy issued through his agency by Pacific Insurance Company.
"Long referred the letter to the office manager, who advised Britt by letter dated November 16, 1987, that the total sales for the period requested were $3,056,205.00. This figure was consistent with the figures being supplied to Hackney for gross sales, although the sales figures quoted to Britt were not for an identical period for which Hackney was provided information.
*812 "Because this sales figure was substantially higher than the original estimate, Britt by letter dated December 16, 1987, enclosed a bill to Banton, Inc., for an additional premium of $45,711.00 plus four percent tax in the amount of $1,828.44.
"By letter dated January 18, 1988, Long then wrote Britt reducing the total gross sales figure by $736,181.72, or by approximately twenty-four percent of the figure originally provided. The reduction was reported as `returns.' The letter from Long to Britt stated:
"`Dear R.C.:

"`Please revise our gross sales figure
as follows:
Previously reported $3,056,205.00
Less returns 736,181.72
 _____________
Total $2,320,023.28

"`This is as you and Jim discussed last week.
 "`Best regards,
 Banton, Inc.
 /s/Jane J. Long
 Vice-President'
"In a follow-up letter dated February 8, 1988, addressed to Britt, Jane Long provided an itemized list of the returns totalling $736,177.00 as follows:
"`Dear R.C.:
"`As requested in your February 1 letter, below you will find the distributor's credited amount listed which comprised the reduction in sales as previously reported to you. Should you require anything additional please give us a call.
 "`Sincerely,
 Banton, Inc.
 /s/Jane
 Jane Long
 Vice President'
"The itemized list of the amounts totalling the $736,177.00 in returns was attached to the letter and showed the following as the accounts to be credited

"`Outdoor equipment $ 69,959.00
"`Nicholson 118,708.00
"`R.W. Distributors 1,739.00
"`Arizona Irrigation 4,605.00
"`J & J Mower 200,295.00
"`Reynolds Service 4,079.00
"`Virginia Outdoor 136,054.00
"`Eichler/RJS 44,052.00
"`Lawn Equipment 52,845.00
"`N I World $103,845.00
 ___________
"`Total $736,177.00'

"Banton and Long failed to disclose to Hackney that the gross sales figures for Banton, Inc., included $736,177.00 of sales for which credits were due.
"Although Banton and Long knew before the date set for closing that the total gross sales figure was due to be reduced by approximately twenty-four percent, they waited until after the closing of the purchase by Hackney before causing Banton, Inc., to issue a credit memorandum cancelling $736,177.00 in accounts receivable reflecting returned merchandise.
"Other examples of purported sales made by Banton, Inc., which were misrepresented to Hackney and others include the following:
"(a) Amount of approximately $200,000.00 shown as account receivable from J & J Sales, who was a Banton, Inc., manufacturer's representative in Westwood, Massachusetts.
"Under the agreement made by Banton, Inc., with J & J Sales, Banton, Inc., shipped its goods directly to J & J Sales' customers, billed the customers, collected from the customers, and then remitted a commission to J & J Sales.
"In August, 1987, J & J Sales received a letter requesting that it confirm an account receivable owed Banton, Inc., in the amount of $203,001.84 in connection with the audit being conducted by the accountant of Banton, Inc., for the fiscal year ended July 31, 1987.
"By letter dated August 17, 1987, Joseph G. Frew for J & J Sales wrote Banton personally as follows:
"`The enclosed request regarding the signing of a financial statement for your auditors is being returned to you for two reasons: (1) I have no intention of signing a statement showing I owe any money to Banton for account receivable deferred ($202,424.58). (2) I would like to know just what the account receivable currently due charges are for. As far as I am concerned, J & J Sales Company does not owe any money to Banton, Inc.'
*813 "On August 24, 1987, Banton wrote J & J Sales, stating:
"`I have asked Bob Morgan to arrange to have shipped and billed to distributors in your assigned area of responsibility that material which we are currently holding for you in the amount of approximately $200,000.00, as we discussed, this should be cleaned up in the next few weeks.'
"In a subsequent letter dated September 29, 1987, Frew for J & J Sales wrote James Banton a letter terminating J & J Sales' relationship with Banton, Inc., immediately. In the same letter, J & J Sales again expressly disclaimed any obligation for any receivable, stating that it had never been part of its undertaking that it would be accountable for or obligated to stock pile an inventory for its customers' needs. In the same letter, Frew noted that he had not received any response to this August 18, 1987, statement.
"Of the merchandise attributable to the account receivable shown as being due for J & J Sales, $170,000.00 worth had never left the premises of Banton, Inc., in Birmingham. No credit memo was made reducing this account receivable until after the closing of the purchase of Banton, Inc., by Hackney on February 2, 1988.
"(b) False accounts receivable and inventory.
"Ries Company, located in Blue Springs, Missouri, agreed to act as a manufacturer's representative for Banton, Inc. It did not undertake any obligation with respect to the purchase of merchandise. Banton, Inc., shipped merchandise in the approximate amount of $214,000.00 or more to the Franklin warehouse in Newton, Kansas, where the merchandise was stored by the Franklin warehouse at the expense of Banton, Inc. Banton, Inc., also added the contents in the warehouse under its insurance coverage. The rate quotation contract from the Franklin warehouse stated that the only persons authorized to withdraw or transfer merchandise were James Banton or Jane Long.
"The merchandise in question had never been sold to the Ries Company and Ries Company had undertaken no obligation to purchase the same. Nevertheless, the books of Banton, Inc., reflected as of October 31, 1987, an account receivable from Ries in the amount of $214,041.43.
"Banton, Inc., then arranged to have the inventory in the Franklin warehouse shipped from Newton, Kansas, to Klughartt-Thornhill in Kansas City, Missouri. Although Klughartt-Thornhill also undertook no obligation to purchase the same, the account receivable balance form Klughartt-Thornhill was shown as of October 31, 1987, as $243,345.42. Banton, Inc., had not eliminated or cancelled the account receivable shown to be due from Ries Company. Thus, Banton, Inc., used the same inventory to show two accounts receivable in the total amount of over $457,000.00 when neither was a valid account receivable.
"It is undisputed that during the months immediately preceding the purchase by Hackney of Banton, Inc., there were a number of other shipments in substantial amounts made pursuant to fictitious orders. In some instances, representatives of companies listed on the books and records of Banton, Inc., as having purchased goods from Banton, Inc., testified that their companies had never bought anything from Banton, Inc.
"Banton, Inc., manufactured garden tillers which it shipped to distributors or wholesalers who in turn sold the machines to retailers or rental stores. In order to induce distributors to purchase the machines in advance, it was customary for Banton, Inc., to allow what it called `booking program terms.' Under these terms, distributors were allowed to defer payment on shipments made to them for periods extending more than six months and up to a year. Also, it is undisputed that it was the general policy at Banton, Inc., that all distributors were allowed to return unsold goods for full credit if they ceased being Banton, Inc., distributors. Evidence was presented that in many instances, Banton, Inc., shipped merchandise to distributors on the condition that the distributor could return any merchandise not sold by it. In *814 effect, such shipments could not be considered sales, since there was no obligation on the part of the distributor to purchase the goods shipped to it.
"From an accounting standpoint, the question whether a shipment may be properly `booked' as a `sale' is not dependent on the terminology employed. In order for a company to `recognize revenue' at the time that goods are shipped, the buyer must have paid for the product or have an obligation to pay that is not contingent upon the resale of the product.
"Financial Accounting Standards Board Statement No. 48 contains the generally accepted accounting principles relating to the sale of goods for which a right to return exists. Even where the shipment is a true sale (not a consignment), if the buyer has the right to return merchandise, Financial Accounting Standards Board Statement No. 48 requires that a reasonable estimate of the amount of future returns be made and that the account receivable be adjusted to reflect the amount which the company reasonably expects to be returned. This may be done either by establishing a reserve for returned merchandise or by some other similar means.
"Even though the merchandise was shipped by Banton, Inc., on the condition that the same could be returned, no adjustment was made in the accounts receivable to reflect the likelihood of returned merchandise.
"There was evidence which was not disputed that the amount established for inventory in the financial statement for the year ended July 31, 1987, was also false. Darryl Davis, plant manager at Banton, Inc., testified concerning instructions given him by Jim Banton about boxing parts to show that they were completed units, as follows:
"`Q. And were the people under your supervision and control the ones responsible for building those 500 tillers?
"`A. Yeah.
"`Q. Were those 500 tillers built before the July '87 inventory?
"`A. No, they weren't built. We put a lot of parts in boxes and set them over there. Some of the units were built but most of it were just parts, like motor parts, transmissions, a handle here, a motor mount there.
"`Q. Did you have any discussions with Jim Banton about putting parts in boxes?
"`A. Wondering how he was going to get away with it, why we were doing it. It seemed like a waste of time to stick a motor in a box and lay it over there. And he said that as long as he had eighty percent of the cost in the box that he could count it as a whole unit during inventory. It didn't
"`Q. Excuse me, I didn't mean to cut you off.
"`A. It didn't make a lot of sense.
"`Q. Who were the people who physically put the parts in the boxes?
"`A. Me, Dale was here, Dale Davis, Vickie Drummond, Jo Jo Davis, Orlando Staples, Yolanda McCants. There was a handful of us that came in on Saturday and Sunday and put the parts in the boxes and stacked them up over there.
"`. . . .
"`Q. Do you have a judgment as to approximately how many boxes contained parts that were not finished units?
"`A. Over two-thirds of them.
"`Q. Two-thirds of 500?
"`A. Yeah. There might have been anywhere from 50 to 100 boxes that had a whole unit in it. And you can look around, there's units that look like they have been used and things like that where they have been used, even those went in boxes. We'd take enough of it off so we could stick it in a box and we'd put it in a box, too. It was nice for me because I got to clean up a lot of junk that was laying around and stick it in a box.
"`Q. Do you know whether the boxes containing parts were counted as part of finished goods during the July '87 inventory?
"`A. To my understanding, they were going to be counted as finished goods.'
"Davis further testified that the boxes were counted by his employees as finished *815 goods and that Banton, Inc., never did build the 500 tillers.
"On January 25, 1988, Hackney sent Long a letter requesting information on various matters, including gross sales, net sales, credits issued and the accounts receivable balance. Long's response included a handwritten ledger page with entries under a column entitled, `Credits Issued Including Disc,' listing only $23,739.00 of credits during the then current fiscal year.
"From the undisputed evidence, it is clear that the financial statements of Banton, Inc., shown to Hackney did not accurately or correctly reflect its true financial condition nor the results of its operations.[1]
"II. HACKNEY'S CLAIM BASED ON VIOLATIONS OF THE ALABAMA SECURITIES ACT.
"Hackney now seeks partial summary judgment with respect to his claim based on violations of the Alabama Securities Act by Banton and Long.
"The Alabama Securities Act, § 8-6-17, Alabama Code 1975, provides as follows:
"`It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly, to:
"`(1) Employ any device, scheme or artifice to defraud;
"`(2) Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
"`(3) Engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.'
"Section 8-6-19(a) provides as follows:
"`(a) Any person who:
"`(1) Sells or offers to sell a security in violation of any provision of this article or of any rule or order imposed under this article or any condition imposed under this article, or
"`(2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission,
"`is liable to the person buying the security from him who may bring an action to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, court costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition.'
"As the supreme court noted in its opinion in Foster v. Jesup & Lamont Securities Co., 482 So.2d 1201, 1207 (Ala.1986), § 8-6-19 is almost identical to § 410(b) of the Uniform Securities Act adopted in Alabama *816 in 1959. The supreme court in Foster, supra, quoted with approval from J. Michael Rediker, `Alabama's "Blue Sky Law"Its Dubious History and Its Current Renaissance,' 23 Ala.L.Rev. 667, 714 (1971), as follows:
"`"... Therefore, to hold a person liable a plaintiff need not show any active connivance or participation by the alleged control person, except in the case of an employee, broker-dealer, or agent; all he need do is establish the defendant's status either as a controlling person, a partner, or an occupant of some other statutory classification [as here a broker-dealer who materially aids in the sale], plus the fact of the seller's liability. The defendant is then left with only one defense, as he is under the federal statute. He may show that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the seller's liability is alleged to exist."'
"On the basis of the undisputed evidence, this court hereby concludes that the financial statements and other financial information provided Hackney with respect to the financial condition of Banton, Inc., contained untrue statements of material fact and also omitted to state material facts necessary in order to make the statements which were made not misleading. This court concludes that Banton and Long engaged in acts, practices, and courses of business which operated as a fraud and deceit on Hackney in connection with the purchase by him of the common capital stock of Banton, Inc.
"This court further concludes that the false and misleading statements concerning the financial condition of Banton, Inc., were material as a matter of law and that under the undisputed evidence Banton and Long knew that the financial condition of Banton, Inc., was misrepresented in material respects to Hackney prior to the time when he agreed to purchase and consummated the purchase of the common stock of Banton, Inc.
"This court concludes from the evidence that both Banton and Long knew that the financial information regarding Banton, Inc., which was provided Hackney prior to the time when he purchased the common stock of Banton, Inc., was false and misleading in material respects. Therefore, it follows that neither Banton nor Long can show that in the exercise of reasonable care either could not have known of the existence of facts which would have clearly established that the information which was provided was false and misleading in material respects.
"In Comeau v. Rupp, Fed.Sec.L.Rept. (CCH), para. 93804, 1988 WL 93977 (D.C. Kans. March 23, 1988), the U.S. District Court for the District of Kansas granted a motion for partial summary judgment in favor of the plaintiffs in connection with their action to rescind the purchase of stock in Rooks County Savings Association sold to them by Terry and C.F. Rupp. The claims for rescission were brought under § 10 of the Securities Act of 1934; § 12.2 of the Securities Act of 1933; and the Kansas Blue Sky Laws.
"The opinion of the district court stated that the purchase price paid had been based on the book value of Rooks County Savings Association being approximately $2.1 million as determined by the auditors prior to closing. However, the auditors later restated the value at approximately $665,000.00 after learning previously undisclosed information about certain of RCSA's loans. The district court also noted, however, that the plaintiffs chose to focus solely on the Winter Park loan in arguing their motion for partial summary judgment, maintaining that the omissions or representations surrounding it alone were sufficient to satisfy their motion and request for summary judgment.
"RCSA had a $350,000.00 interest in the Winter Park loan for the development of property near the Colorado ski resort. The Rupps had informed the directors of RCSA that it would be receiving a first loan position. However, five months before the loan was funded by RCSA, another financial institution operated by Terry Rupp had already received a second lien on an earlier loan commitment. Of the proceeds of the *817 loan from RCSA, $18,000.00 was used to pay delinquent interest on an earlier loan made by Farmers National Bank. The Rupps were majority owners and directors of Farmers National Bank. Instead of having a first loan position, RCSA received a fourth lien position on the $350,000.00 loaned by it with $3 million in prior liens ahead of it. Discussing this omission or misrepresentation alone, the district court stated:
"`Defendant argues, however, that the lien position is not material to this suit; the Comeaus weren't buying the loan, they were buying stock in a holding company. This argument is specious at best. The purchase price of the stock was based on the value of RCSA. Inadequate knowledge as to the poor condition of RCSA's loan portfolio caused the auditor to overstate the value. Therefore, a reasonable investor in the plaintiffs' position would clearly consider the fact that a $350,000.00 loan in the portfolio would be a total loss to be of "actual significance." This was information that would have affected the plaintiffs' decision to buy the stock.'
"The district court referred to the decision of the Supreme Court of the United States in TSC Industries, Inc. v. Northway, Inc., 426 U.S 438, 449 [96 S.Ct. 2126, 2132, 48 L.Ed.2d 757] (1976), in discussing materiality. The district court quoted with approval the following from the Supreme Court opinion:
"`"An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... [T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the `total mix' of information made available."'
"The district court further stated:
"`... Under the TSC test, it is not necessary to prove that disclosure of the omitted facts would have caused a reasonable investor to change his decision, just that the facts "would have assumed actual significance in the deliberations of the reasonable shareholder." 426 U.S. at 449 [96 S.Ct. at 2132]....'
"This Court concludes in summary on the basis of the undisputed evidence presented in this case that the motion for partial summary judgment filed by Morris Hackney in his claim under § 8-6-19, Alabama Code 1975, is due to be granted.
"III. IMPOSITION OF A CONSTRUCTIVE TRUST
"Hackney has sought in this case to have a constructive trust imposed over the money and also the real estate purchased by Banton with the cash proceeds received by him from Hackney as a result of the sale of the common stock of Banton, Inc. The evidence presented by Hackney indicated that Banton received cash in the amount of $683,908.59 at the closing of the sale of the common stock of Banton, Inc., on February 2, 1988. He deposited the entire amount received from Hackney evidenced by checks signed by Hackney into a newly opened account of Colonial Bank (the `Colonial account').
"Banton then signed the following checks drawn on the Colonial account:
"(1) A $42,718.45 check dated February 3, 1988, payable to Sam Sumner, the business broker;
"(2) A $14,498.15 check dated February 4, 1988, payable to Banton's mother; and
"(3) An $8,118.40 check also dated February 4, 1988, payable to Banton's mother.
"On February 10, 1988, Banton went to AmSouth Bank and, on the strength of Hackney's personal guarantee, borrowed $400,000.00. Banton also deposited the proceeds of the AmSouth loan in the Colonial account later that day.
"On February 10, 1988, Banton withdrew $404,569.95 from the Colonial account and paid in full the indebtedness secured by a mortgage on his home. He wrote another check drawn against the Colonial account in the amount of $153,387.68 to pay in full the indebtedness secured by a mortgage on his condominium.
"On February 22, 1988, the sum of $350,000.00 was withdrawn from the Colonial account and deposited in the name of Banton's *818 wife, Susan Banton, in a Florida bank. No consideration was paid to Banton for the transfer of the $350,000.00 to Susan Banton.
"The proceeds of the stock sale have therefore been traced to: (1) satisfaction of the $404,569.95 mortgage on Banton's residence; (2) the $350,000.00 certificate of deposit in the name of Susan Banton; and (3) the satisfaction of the $153,387.68 mortgage on the condominium.
"Susan Banton, the wife of James Banton, is also named as a defendant in this action.
"Counsel for Banton argues that Hackney is not entitled to impose a constructive trust on assets traced from the funds paid to Banton in connection with the purchase of Banton, Inc. Counsel says that the Alabama courts have consistently found constructive trusts only in situations where fiduciary or special relationships exist. Counsel has relied principally on the decision of the Supreme Court of Alabama in First Nat'l Bank of Mobile v. Pope, 274 Ala. 395, 149 So.2d 781 (1963). In that case, the First National Bank of Mobile filed a complaint in equity seeking to impose a constructive trust on life insurance proceeds and certain real estate. The complaint alleged in substance that Pope (since deceased) had obtained money from the bank in the form of a loan by making false representations to the bank as to his worth and the amount of business he was doing; that Pope had invested some of the loan proceeds for the payment of premiums on life insurance policies payable on his death to his wife and had used some of the loan proceeds for the payment of the purchase price of a homestead which passed on his death to his wife.
"The allegations of the complaint as amended stated more specifically that Pope had produced fictitious invoices representing sales of flour or other commodities to a dealer outside Mobile, `which flour was then supposed to be in transit to the buyer and the buyer was supposed to pay for the flour within thirty days.'
"The trial court sustained the demurrers to the complaint. On appeal, the Supreme Court of Alabama affirmed, concluding that the relationship between Pope and the bank was one of debtor and creditor. The majority opinion concluded that a constructive trust would not be impressed where there was no fiduciary relationship between the bank and Pope.
"In a strong dissenting opinion by Justice Lawson, concurred in by Justice Goodwin, it was pointed out that a fiduciary relationship was not essential to the establishment of a constructive trust. Justice Lawson cited § 160 of the Restatement of Restitution, as well as 4 Scott on Trusts, 2d ed. §§ 507, 508 and 508.1.
"The dissenting opinion also pointed out that the majority opinion itself held that the impression of a constructive trust was not limited to cases involving a fiduciary relationship and was not to be so construed.
"Counsel for Banton also argues that Hackney's claims are based upon an arm's length negotiated contract. This court does not agree. This was not a case where the buyer was buying property `as is' with no representations or statements made by the seller concerning the same. Instead, there were a very great number of express and specific warranties concerning the financial condition of Banton, Inc., and the financial statements of Banton, Inc., shown to Hackney prior to his agreeing to the purchase of Banton, Inc. In order to hold that the transaction involving the sale of the stock of Banton, Inc., was an arm's length transaction, it would be necessary to completely ignore the financial statements and other information provided Hackney by Banton and Long concerning the financial condition of Banton, Inc., and the results of its operations. As this court has noted earlier in this opinion, it has been established beyond dispute that the financial statements were materially false and misleading in representing the financial condition of Banton, Inc., and the results of its operation.
"In Jackson Co. v. Faulkner, 55 Ala. App. 354, 315 So.2d 591 (1975), Jackson Company sold a residential lot to Faulkner *819 pursuant to a contract which included the following provisions:
"`The sale of this lot is not contingent on percolation test.
"`It is understood and agreed that this lot has not been approved by the county health department for a septic tank.'
55 Ala.App. at 359, 315 So.2d at 595.
"The contract was dated April 25, 1972. Jackson Company did not tell Faulkner that on November 17, 1959, it had received a letter from the Jefferson County Department of Health stating that the particular lot could not be approved for septic tank use because of rock and ground water problems.
"Faulkner brought his action, relying in part on Title 7, Section 109, Alabama Code 1940 (now found as § 6-5-102, Alabama Code 1975). That statute reads as follows:
"`Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.'
"In Faulkner, it was contended on appeal that there was no evidence of a fiduciary relationship and that the trial judge erred in charging the jury that a confidential or fiduciary relationship existed between Faulkner and Jackson Company. The Court of Civil Appeals concluded that there was sufficient evidence to make it a jury question whether there was a confidential relationship. The Court of Civil Appeals stated:
"`"`Where one responds to an inquiry, it is his duty to impart correct information, and he is guilty of fraud if he denies all knowledge of a fact which he knows to exist, or he gives equivocal, evasive, or misleading answers calculated to convey a false impression, even though literally true as far as they go, or if he fails to disclose the whole truth.'"'
55 Ala.App. at 363-64, 315 So.2d at 599-600 (citations omitted).
"In the present case now before this court, Banton and Long responded to inquiries concerning the financial condition of Banton, Inc. As the Court of Civil Appeals noted in Faulkner, there can be a basis under the circumstances of a case for holding that a confidential relationship does exist. With respect to the financial information imparted by Banton and Long to Hackney, this is such a case.
"Furthermore, there is ample authority for the proposition that the imposition of a constructive trust does not always require the finding of a fiduciary or confidential relation. Section 160, Restatement of Restitution, provides:
"`Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises.'
"Comment a to the above section provides in part as follows:
"`a. Constructive trusts and express trusts. The term "constructive trust" is not altogether a felicitous one. It might be thought to suggest the idea that it is a fiduciary relation similar to an express trust, whereas it is in fact something quite different from an express trust. An express trust and a constructive trust are not divisions of the same fundamental concept. They are not species of the same genus. They are distinct concepts. A constructive trust does not, like an express trust, arise because of a manifestation of an intention to create it, but it is imposed as a remedy to prevent unjust enrichment. A constructive trust, unlike an express trust, is not a fiduciary relation, although the circumstances which give rise to a constructive trust may or may not involve a fiduciary relation....' (Emphasis added.)
"Comment d provides as follows:
"`d. Unjust enrichment and unjust deprivation. In most cases where a constructive trust is imposed the result is to restore to the plaintiff property of which he has been unjustly deprived and to take from the defendant property the retention of which by him would result in a corresponding unjust enrichment of the *820 defendant; in other words the effect is to prevent a loss to the plaintiff and a corresponding gain to the defendant, and to put each of them in the position in which he was before the defendant acquired the property.'
"See, also, 5 Scott on Trusts § 461, p. 3410 (3d ed. 1967), in which the author points out that the concept of a constructive trust does not necessarily involve a fiduciary or trust relationship.
"`Although the constructive trust is a remedial device sometimes available for the redress of a breach of an express trust, it is available also in numerous and varied situations wholly unconnected with express trusts. It is available where property is obtained by mistake or by fraud or by other wrong....'
"See, also, Bogert, The Law of Trusts and Trustees, § 471 at p. 8 (Revised 2d ed. 1978), which states the following:
"`"... A constructive trust, or as frequently called an involuntary trust, is a fiction of equity, devised to the end that the equitable remedies available against a conventional fiduciary may be available under the same name and processes against one who through fraud or mistake or by any means ex maleficio acquires property of another."
"`"A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.... A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief." Another learned writer has referred to this trust as "specific restitution of a received benefit in order to prevent unjust enrichment."' (Citations omitted.)
"In Note, Must the Remedy at Law be Inadequate Before a Constructive Trust Will be Impressed?, 25 St. John's L.Rev. 283, 287 (1951), the author states:
"`Dean Ames tells us that "[a]lthough in a few early American cases the courts decline to permit the owner of property to recover its product as a constructive trust if the misappropriation was by a person other than fiduciary, it is now well settled that one who has been deprived of his property by fraud, by theft, or by any wrongful conversion, may charge the fraudulent vendee, the thief, or other wrongful converter as a constructive trustee of any property received in exchange for the misappropriated property."' (Citation omitted.)
"In Coppinger v. Superior Court of Orange County, 134 Cal.App.3d 883, 185 Cal. Rptr. 24 (Cal.Ct.App.1982), Diana and Donald Coppinger sold their home to Diane McKay for the sale price of $152,000.00. The evidence was that the Coppingers, due to previous inspections, were on notice that the foundations of the home were infested with termites. After the sale, McKay discovered termites in the interior walls in the living room, bathroom, and hallway, and additional cracks in the foundation through which termites were travelling in large numbers.
"Meanwhile, the Coppingers had used the proceeds received by them from the sale of that house to purchase another residence.
"McKay filed an action against the Coppingers on theories of fraud, negligence, breach of implied warranty, strict liability, and nuisance. McKay also had a notice of lis pendens recorded against the new residence purchased by the Coppingers. The Coppingers then filed a motion to expunge the lis pendens notice. On appeal, the court of appeals concluded that McKay had the right to trace the money paid by her to the home purchased by the Coppingers. The court of appeals stated:
"`Constructive trust is an equitable remedy to prevent unjust enrichment and enforce restitution, under which one who wrongfully acquires property of another holds it involuntarily as a constructive trustee, and the trust extends to property acquired in exchange for that wrongfully taken. (Haskell [Haskel] Engineering *821 & Supply Co. v. Hartford Acc. & Indem. Co., (1978) 78 Cal.App.3d 371, 375, 144 Cal.Rptr. 189; Kraus v. Willow Park Golf Course, (1977) 73 Cal.App.3d 354, 373, 140 Cal.Rptr. 744.)'
"In Middlebrooks v. Lonas, 246 Ga. 720, 272 S.E.2d 687 (1980), Mary Middlebrooks stated in her complaint that she loaned $25,000.00 to her parents, W.L. and Elvira Lonas. She made a claim of fraud, stating that at the time her parents promised to repay the loan they had no intention of doing so. Middlebrooks sought to impose a constructive trust in her favor on the home which the Lonases built with the $25,000.00 loaned to them. Reversing a summary judgment granted by the trial court in favor of the Lonases, the Supreme Court of Georgia concluded that if Middlebrooks could prove that the fraudulently procured funds were used to purchase other property, she could reach the other property `by a proceeding in equity and ... can enforce a constructive trust or an equitable lien.'
"In Meadows v. Bierschwale, 516 S.W.2d 125 (Tex.1974), Bierschwale sold an apartment complex to Herbert C. Oakes in return for fifty-nine promissory notes payable to Oakes and executed by three persons, James H. Shoffner, William E. Goyen, Jr., and Louis R. Davis.
"Oakes then conveyed the apartment complex to his wholly owned corporation, United Properties, Inc., and it in turn sold the apartment complex to Eugene J. Goldman, a bona fide purchaser, in exchange for $40,000.00 in cash plus twenty-four notes, (the `Goldman notes') twenty-three in the principal amount of $4,000.00 and a final note in the principal amount of $1,879.10.
"The notes signed by Shoffner, Goyen and Davis were worthless. Bierschwale filed an action to rescind the sale and also sought to impress a constructive trust on the proceeds of the Goldman sale received by Oakes's corporation when it sold the apartment complex. The trial court awarded Bierschwale and the agent a constructive trust on the Goldman notes. On appeal, the Supreme Court of Texas affirmed. Its opinion stated:
"`Oakes'[s] first contention is that a constructive trust requiring the defendant to account for profits is an appropriate remedy only when breach of a fiduciary relationship is involved. This is clearly erroneous. "[T]he circumstances which give rise to a constructive trust may or may not involve a fiduciary relationship." Restatement of Restitution § 160, Comment a at 641. It is not essential for the application of the constructive trust doctrine that a fiduciary relationship exist between the wrongdoer and the beneficial owner. Actual fraud, as well as breach of a confidential relationship, justifies the imposition of a constructive trust. Thigpen v. Locke, 363 S.W.2d 247 (Tex.1962); Fitz-Jerald [Gerald] v. Hull, 150 Tex. 39, 237 S.W.2d 256 (1971 [1951]); Pope v. Garrett, 147 Tex. 18, 211 S.W.2d 559 (1948); Mills v. Gray, 147 Tex. 33, 210 S.W.2d 985 (1948); Miller v. Huebner, 474 S.W.2d 587 (Tex.Civ. App.Houston [14th Dist] 1971, writ ref'd n.r.e.).'
"In the present case before this court, Banton and Long intentionally misrepresented the financial condition of Banton, Inc., and the results of its business operations in material respects, and thereby fraudulently obtained $1,100,000.00 from Hackney. Hackney has also provided conclusive evidence tracing the following amounts paid by Banton: $350,000.00 certificate of deposit purchased in the name of Susan Banton; $404,569.95 paid in satisfaction of a mortgage on his residence; and $153,387.68 paid in satisfaction of a mortgage on a condominium owned by Banton and his wife, Susan Banton, located in Okaloosa County, Florida. Hackney is therefore legally entitled to impose a constructive trust on all such sums as representing the proceeds of the amount paid by him to Banton in connection with the purchase of the common stock of Banton, Inc., such purchase which he is now entitled to rescind.
"In accordance with this opinion, it is hereby ordered by this court as follows:
"1. Judgment is hereby rendered in favor of T. Morris Hackney against James F. *822 Banton and Jane J. Long on the claims asserted by Morris Hackney under § 8-6-19(a)(2), Alabama Code 1975. It is hereby declared by the court that the purchase of the stock of Banton, Inc., made by Morris Hackney is hereby rescinded.
"2. Judgment is hereby rendered in favor of T. Morris Hackney against James F. Banton in the amount of $1,083,980.50 plus interest at the rate of six percent per annum from February 2, 1988, representing the proceeds paid by T. Morris Hackney to James F. Banton in connection with the purchase of the stock of Banton, Inc. Judgment is hereby rendered in favor of T. Morris Hackney against Jane J. Long in the amount of $16,019.41 plus interest at the rate of six percent per annum from February 2, 1988, representing the proceeds paid by T. Morris Hackney to Jane J. Long in connection with the purchase of the common stock of Banton, Inc. These judgments are pro tanto judgments and represent only part of the damages sustained by T. Morris Hackney. T. Morris Hackney reserves the right to make claim for the additional damages he has sustained in connection with and as a result of the transaction involving the purchase of stock of Banton, Inc.
"3. As stated in this opinion, T. Morris Hackney guaranteed a loan made by AmSouth Bank to James F. Banton, and AmSouth Bank has obtained a judgment against both James F. Banton and T. Morris Hackney. That judgment has been partially paid or satisfied by the payment of the monies ordered paid to the Register of this Court from the $350,000.00 certificate of deposit formerly held by a Florida bank. The judgment in favor of T. Morris Hackney against James F. Banton will therefore be partially reduced or satisfied to the extent of such payment.
"Upon satisfaction of the above judgments in full by the defendants James F. Banton and Jane J. Long, the Register is directed to deliver the outstanding capital stock of Banton, Inc. (which Hackney has tendered to the Register) to James F. Banton and Jane J. Long, who now own such subject to their obligations set forth in this order to repay Hackney.
"4. Judgment is hereby rendered declaring that T. Morris Hackney is entitled to impose a constructive trust on the residence of James F. Banton at 2748 Abingdon Road, Birmingham, Alabama. It is hereby declared that Hackney is subrogated to the right of the mortgagees whose mortgages were satisfied with the proceeds of the stock sale in the same manner and to the same extent as if such mortgages had been assigned by the mortgagees to T. Morris Hackney by virtue of the satisfaction of said mortgages with funds fraudulently obtained from T. Morris Hackney. An equitable lien on the following described real estate in the amount of $404,569.95 plus interest from February 2, 1988, at the rate prescribed in the note secured by the mortgage and on the same terms and conditions as the mortgage is hereby declared. The legal description of the real estate is as follows:
"`Lot 2 according to the Map and Survey of Abingdon, Jefferson County, Alabama, as recorded in Map Book 19, Page 87, in the records in the Office of the Judge of Probate of Jefferson County, Alabama, with the exception of the following described parcels:
"`Parcel 1:
A strip along the east side thereof, more particularly described as follows: Beginning at the SW corner of Lot 1, in said Abingdon Survey, which is a point on the center line of the present driveway running along the southern boundary of said Lot 1; thence in a northerly direction along the western boundary line of said Lot 1 to the NW corner of said Lot 1; then north 88 [degrees] 24' west 1.2 feet; thence south 1 [degree] 35' west 302.9 feet; thence south 11 [degrees] 4' east 329.55 feet to a point on the center line of said driveway; thence north 69 [degrees] 6' east along the center line of said driveway to the point of beginning.
"`Parcel 2:
A strip along the west side thereof, more particularly described as beginning at the NW corner of said Lot 2 and run east *823 along the north boundary line of said lot a distance of 32.16 feet; thence an angle to the right of 81 [degrees] 9' and run southerly 237.56 feet to an intersection with the line dividing Lots 2 and 3, in said Abingdon Survey; thence north along said dividing line 244.59 feet to the point of beginning.
"`Parcel 3:
Commence at the NE corner of Lot 2 of said Abingdon Survey and run thence westwardly along the north line of said lot 2 for a distance of 259.34 feet; thence turn an angle to the left of 98 [degrees] 51' and run southeastwardly for a distance of 192.07 feet to a point 0.5 feet south of the south edge of the poles on a power line running across said Lot 2; then 79 [degrees] 00' left and run east running parallel to and 0.5 feet south of the south edge of the poles on said power line for 258.32 feet; thence 88 [degrees] 26' to the right and run southwardly for 9.68 feet to the corner post of a steel fence which point is apparently the NW corner of Lot 1 of the Abingdon Survey; then 90 [degrees] 40' 22" left and run east for 153.65 feet to a point in Cahaba Road; thence 135 [degrees] 52' 38" left and running northwesterly along Cahaba Road 174.85 feet; then 13 [degrees] 13' right and continue northwesterly along Cahaba Road for 103.90 feet to the point of beginning.'
"5. T. Morris Hackney is also subrogated to the rights of the mortgagee holding the mortgage on the condominium owned by James F. Banton and his wife Susan A. Banton, located in Okaloosa County, Florida. An equitable lien on the following-described real estate is hereby declared in the amount of $153,387.68 plus interest from February 2, 1988, at the rate prescribed in the note secured by that mortgage and on the same terms and conditions stated in that mortgage. The legal description of the condominium property is hereby set forth as follows:
"`The condominium parcel known as Apartment Unit No. 3071, of Shoreline Towers Condominium III, a condominium, according to the Declaration of Condominium, recorded in Official Records Book 759, Page 928, et seq., and pursuant to Survey Plot Plan and Graphic Description of Improvements recorded in Condominium Book 1, Page 73, et seq., all of the public records of Okaloosa County, Florida, together with all appurtenances to the said condominium parcel, including but not limited to, all rights under the recreation facilities lease and the Gulf Beach covenants agreement, all easements, and the undivided interest in the common elements appurtenant thereto as set forth in said declaration.'
"6. James F. Banton and Susan A. Banton are hereby enjoined and ordered not to transfer, encumber or sell their interest in the residence at 2849 Abingdon Road, Mountain Brook, Alabama, or their interest in the condominium located at 3071 Shoreline Towers Condominium in Destin, Florida, except as follows:
"James F. Banton and Susan A. Banton may execute mortgages or conveyances on said properties which are expressly and unambiguously subject to and inferior to Hackney's interest therein in the amount of $404,569.95 plus interest on the Abingdon Road property and in the amount of $153,387.68 plus interest on the condominium.
". . . .
"8. All remaining issues (including the remaining claims for damages asserted by T. Morris Hackney) are hereby set for trial...."
"Done this 6th day of December, 1988.
 "/s/Marvin Cherner
 "CIRCUIT JUDGE"
On February 28, 1989, Judge Cherner overruled the Bantons' motion to reconsider the summary judgment entered on Hackney's claim under the Blue Sky Laws; overruled the Bantons' motion to dissolve or vacate the injunction issued on December 6, 1988; and granted Hackney's motion to make the December 6, 1988, judgment final pursuant to Rule 54(b), A.R.Civ.P.
On March 2, 1989, the Bantons appealed from that final judgment. The Bantons subsequently filed an "Appellants' Brief" and an "Appellants' Reply Brief." On March 3, 1989, however, the Bantons filed *824 a "Motion to Dissolve Injunction or Alternative Appeal or Petition for Writ of Mandamus" (hereinafter "alternative appeal") with this Court. Hackney later filed a motion to dismiss the appeal, which we ordered considered upon submission of the case on the merits.
We deny the motion to dismiss the appeal, and treat the "alternative appeal" as a petition for a writ of mandamus. Because we hold that the appeal is adequate to raise the issues insisted upon by the appellant, the "alternative appeal," here treated as a petition for writ of mandamus, is moot.
The Bantons raise only two issues in their appellate brief, and we shall address those issues only.[2]
The Bantons first argue that the Securities Act of Alabama, Code 1975, § 8-6-1 et seq., does not apply in this case. Specifically, the Bantons maintain that the transfer of 100% of the capital stock of a corporation is not the sale of a "security" as that term is used in Code 1975, § 8-6-19. We disagree.
Still true today is our recognition, made seven years ago, that "since there are few Alabama cases construing the Alabama securities laws, federal cases should be reviewed to aid in the proper interpretation of the corresponding sections of Alabama statutory law inasmuch as the sections are virtually identical." Buffo v. State, 415 So.2d 1158, 1162 (Ala.1982). The definition of "security" in our State act, set forth at Code 1975, § 8-6-2(10), is certainly as broad as, if not broader than, its federal counterpart, § 2(1) of the Securities Act of 1933 ("1933 Act"), codified as amended, 15 U.S.C. § 77b(1). Accordingly, we look to federal case law interpreting § 2(1) of the 1933 Act for assistance in the case at bar.
In Landreth Timber Co. v. Landreth, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), Justice Powell, writing for an 8-1 majority, stated the issue as "whether the sale of all of the stock of a company is a securities transaction subject to the antifraud provisions of the federal securities laws." Id. at 683, 105 S.Ct. at 2300. Rejecting the "sale of business" doctrine (which protected from the application of the antifraud provisions the sale of 100% of the stock of a closely held corporation), the Court found that the language of § 2(1) of the 1933 Act and sound public policy compelled the conclusion that a transaction involving the transfer of all of a company's stock was indeed subject to the antifraud provisions of the 1933 Act. Id. at 685-88, 696, 105 S.Ct. at 2301-03, 2307; see also Gould v. Ruefenacht, 471 U.S. 701, 704, 105 S.Ct. 2308, 2310, 85 L.Ed.2d 708 (1985).
We see no reason not to apply the Landreth rationale to our State securities laws. Although the Bantons warn us that by adopting Landreth we invite a flood of securities litigation in state courts, "[w]e find more daunting ... the prospect that parties to a transaction may never know whether they are covered by [the securities laws] until they engage in extended discovery and litigation over a concept as often elusive as the passage of control." Landreth, 471 U.S. at 681, 105 S.Ct. at 2299.
We reject the Bantons' argument that the sale of all of the capital stock of a corporation is not the sale of a "security" for the purposes of civil liability under § 8-6-19.
The Bantons also argue that summary judgment was erroneously entered on the claim under the Securities Act of Alabama. Specifically, they point out that questions of intent and of the materiality of statements that induced a plaintiff to act are rarely subject to determination as a matter of law on a motion for summary judgment. We agree that in this case those questions were not properly to be answered at the summary judgment stage.
Summary judgment is appropriate when, under the facts presented, reasonable *825 minds could reach only the conclusion reached by the trial court and the moving party is entitled to a judgment as a matter of law. Summary judgment is improper, however, where there are genuine questions of fact presented. Green v. Blue Cross-Blue Shield of Alabama, 358 So.2d 466 (Ala.1978); Rule 56, A.R.Civ.P.
In the case at bar, we find that such questions of fact are presented, and, therefore, we conclude that summary judgment was improper. The trial judge's opinion, set out hereinbefore, reflects the careful consideration given this matter at the trial stage. However, certain facts set out in that opinion can only be considered findings of fact made as a result of weighing the evidence presented to the court. For example, the court resolved the issue of the falsity of certain representations of Banton's financial condition. This conclusion necessarily required that the trial court balance and consider questions of fact.
The more difficult question, however, is the status of the constructive trusts and the equitable liens imposed by the trial court once the summary judgment on the fraud claims that give rise to imposition of the constructive trust and equitable liens is declared invalid. We do not believe that the constructive trusts and equitable liens set up by the trial court are dissolved by our decision on the summary judgment issue. The preliminary injunctive relief granted by the trial court, and the related constructive trusts and equitable liens, are still in force. The trial court may grant "temporary relief pending a final adjudication on the merits." Dairy Queen v. Wood, 369 U.S. 469, 479 n. 20, 82 S.Ct. 894, 901, 8 L.Ed.2d 44 (1962). See also D. Dobbs, Remedies, § 2.6 at 74-78. We note that the plaintiff, Hackney, has filed a bond to support the injunctive relief granted by the trial court.
In light of the above, the preliminary injunctive relief is valid and remains in force to preserve preliminarily the constructive trusts and the equitable liens imposed by the trial court. However, permanent injunctive relief and final imposition of constructive trusts and equitable liens must be conditioned on a jury verdict. See Dairy Queen v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) (holding, on the basis of the Seventh Amendment, that in federal courts the jury must decide factual questions regarding "legal" claims before the court can grant "equitable" relief based upon the same factual matters), and Cumens v. Garrett, 294 Ala. 535, 319 So.2d 665 (1975), and Crommelin v. Fain, 403 So.2d 177 (Ala.1981) (applying that same principle but based upon § 11, Ala. Const. 1901).
Although we reverse because the summary judgment was improperly entered, we agree that the Alabama securities laws apply to a sale of a business and the transfer of all of its stock. The judgment of the trial court is due to be reversed and the cause remanded for further proceedings consistent with this opinion. The writ of mandamus is denied.
88-637MOTION TO DISMISS DENIED; REVERSED AND REMANDED.
88-632WRIT DENIED.
HORNSBY, C.J., and JONES, ALMON, ADAMS, STEAGALL and KENNEDY, JJ., concur.
MADDOX and HOUSTON, JJ., concur in part and dissent in part.
HOUSTON, Justice (concurring as to 88-632) (concurring in part and dissenting in part as to 88-637).
I concur in 88-632 in denying the petition for writ of mandamus. I dissent in 88-637, for I would affirm the trial court's judgment. I concur with the majority's reasoning and conclusion on the issue of whether the sale of all of the stock of a corporation is the sale of a "security" for the purposes of civil liability under § 8-6-19. However, I am persuaded that evidence on material facts as to the claim based on violation of the Alabama Securities Act is, as the learned trial court frequently says that it is, "undisputed." Therefore, under the law as I understand it to be and the facts in the *826 record, I would affirm this partial summary judgment.
MADDOX, J., concurs.

ON APPLICATION FOR REHEARING
PER CURIAM.
The trial court granted Hackney's motion for summary judgment on a claim under the Alabama Blue Sky Law, Code 1975, § 8-6-19. Hackney points out on application for rehearing that issues such as intent are not of concern in an action under § 8-6-19. The Alabama Securities Commission has also filed an amicus curiae brief in which this ambiguity in our original opinion dated September 29, 1989, is pointed out. We agree that there may be an ambiguity in our original opinion; therefore, we extend that opinion to modify its holding to accord with the law.
Code 1975, § 8-6-19, provides as follows:
"§ 8-6-19. Civil liabilities of sellers, agents, etc.; remedies of purchasers.
"(a) Any person who:
"(1) Sells or offers to sell a security in violation of any provision of this article or of any rule or order imposed under this article or of any condition imposed under this article, or
"(2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission, is liable to the person buying the security from him who may bring an action to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, court costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition.
"(b) Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."
Subsection (a) of this statute is very similar to both § 12(2) of the Securities Act of 1933 and § 410(a)(2) of the Uniform Securities Act. There is no requirement in § 12(2) or § 8-6-19 that a plaintiff under these statutes prove "intent" to defraud as an element of his claim. See, e.g., Hill York Corp. v. American Int'l Franchises, Inc., 448 F.2d 680 (5th Cir.1971) (plaintiff need only prove that defendant offered or sold securities in interstate commerce with misrepresentations or omissions of material facts); Phillips v. Alabama Credit Corp., 403 F.2d 693 (5th Cir.1968) (no need to prove intent on part of plaintiff; affirming summary judgment for the plaintiff); First Federal Savings & Loan Ass'n of Miami v. Mortgage Corp. of the South, 467 F.Supp. 943 (N.D.Ala.1979) (§ 8-6-19 does not require scienter, and liability may attach for a mere negligent misrepresentation; § 8-6-19 contrasted with Rule 10(b)5 and common law fraud, both of which require scienter).
Section 12(2) and § 8-6-19 are "strict liability" statutes. There need be no showing of "reckless disregard" for the truth of a representation or that such representations were "knowingly" made. Odette v. Shearson, Hammill & Co., 394 F.Supp. *827 946, 956 (S.D.N.Y.1975). Under a strict liability analysis, the seller of the security in question may have a defense of "due care," i.e., that he did not know and in the exercise of reasonable care could not have known of the alleged false representation of material fact. What results from this analysis is that a negligent misrepresentation will suffice to create liability under § 12(2). Odette, 394 F.Supp. at 956, see also Cook v. Avien, Inc., 573 F.2d 685, 693 (1st Cir.1978) (construing § 8-6-19); White v. Sanders, 650 F.2d 627 (5th Cir.1981) (construing § 8-6-19); Nelson v. Quimby Island Reclamation Dist. Facilities Corp., 491 F.Supp. 1364 (N.D.Cal.1980) (construing § 12(2)).
It is clear from these authorities that "intent" need not be proven before a plaintiff may recover under § 8-6-19. Indeed, the defendant's state of mind should be relevant only insofar as it relates to his possible defenses under the statute. The seller has the affirmative defenses of lack of knowledge of falsity and the buyer's knowledge of falsity. The defendant's state of mind is not otherwise relevant. Odette v. Shearson, Hammill & Co., supra, at 956.
We decline, however, to modify our original holding that summary judgment was improper in this case. As we noted on original deliverance, there are factual issues to be determined by a jury, e.g., whether the Bantons knew or, in the exercise of due care, should have known of the misrepresentations.
OPINION EXTENDED; APPLICATION OVERRULED.
HORNSBY, C.J., and JONES, ALMON, ADAMS, STEAGALL and KENNEDY, JJ., concur.
MADDOX and HOUSTON, JJ., concur in part and dissent in part.
NOTES
[1] "It is not necessary to burden this opinion with all of the evidence presented in detail concerning the financial condition of Banton, Inc. It was established, however, by the testimony of Terry Humber, a certified public accountant employed by Hackney following the purchase by him of Banton, Inc., that the accounts receivable as of December 31, 1987, were overstated by $1,960,000.00, involving a write-down from $3,859,000.00 to $1,899,000.00 and that this write-down was evidenced by credit memos actually issued. Humber testified:

"`... Now, I continue to make a distinction there because it is my opinion that it's overstated by more than that for consigned inventory, which is not on here. These credit memos are history. They have been sent to the customer and the accounts have been written off. So I'm saying that the company has written these accounts off and all I'm doing is rolling them back to where they were on the receivable detail. So I didn't have to reach any kind of opinion regarding whether they were good receivables or not because the company had written them off.'
[2] Although several issues raised in the "alternative appeal" could have been reviewed had they been raised on appeal, the appellate brief makes no mention of those issues. Accordingly, we shall not address those issues; doing so would be tantamount to accepting more than the one appellant's brief permitted by Rule 28, A.R. App.P.